# 15-588-cv

# United States Court of Appeals
## for the
## Second Circuit

—————————————————————

IN RE SANOFI SECURITIES LITIGATION

—————————————————————

GLENN TONGUE, individually and in his capacity as General Partner
of Deerhaven Capital Management,

*Plaintiff-Appellant,*

JOHN SOLAK, VINCENT STASIULEWICZ,

*Plaintiffs,*

– v. –

SANOFI, CHRISTOPHER VIEHBACHER, JÉRÔME CONTAMINE,
DAVID MEEKER,

*Defendants-Appellees,*

SANOFI PHARMACEUTICALS, INC.,

*Consolidated Defendant.*

————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

JOHN A. NEUWIRTH
JOSHUA S. AMSEL
CAROLINE HICKEY ZALKA
JUSTIN D. D'ALOIA
WEIL, GOTSHAL & MANGES LLP
*Attorneys for Defendants-Appellees*
767 Fifth Avenue
New York, New York 10153
(212) 310-8297

## <u>RULE 26.1 CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee Sanofi, a non-governmental party, states that it has no parent corporation and no publicly held corporation owns 10% or more of its shares.

# TABLE OF CONTENTS

**Page**

COUNTERSTATEMENT OF THE ISSUES..............................................................1

COUNTERSTATEMENT OF THE CASE................................................................2

    A.    Preliminary Statement ................................................................2

    B.    The Disposition Below................................................................4

COUNTERSTATEMENT OF THE FACTS ...........................................................10

    A.    The Parties ...............................................................................10

    B.    Background Of Lemtrada And Sanofi's Acquisition Of
Genzyme...................................................................................10

    C.    Regulatory Framework For New Biological Drugs...........................11

    D.    Genzyme's Development of Lemtrada .................................14

        1.    The Phase 2 Study...............................................14

        2.    The Phase 3 Studies ............................................15

    E.    Defendants' Public Disclosures Regarding Lemtrada .......................18

    F.    Regulatory Action On Lemtrada ...........................................21

SUMMARY OF THE ARGUMENT ......................................................................23

STANDARD OF REVIEW ....................................................................................26

ARGUMENT .........................................................................................................26

I.    THE APPLICABLE LEGAL STANDARDS .............................................26

II.    THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFF
FAILED TO PLEAD SCIENTER.............................................................29

    A.    Plaintiff Fails To Satisfy *Tellabs*.........................................30

    B.    Plaintiff Does Not And Cannot Allege Any Discernible Motive .......33

i

  1. Plaintiff's Motive Arguments Have Been Waived ...................34

  2. Plaintiff's New Motive Arguments Fail ....................................35

 C. Plaintiff Fails To Plead Conscious Misbehavior Or
  Recklessness ........................................................................................36

III. THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFF
 FAILED TO PLEAD AN ACTIONABLE MISSTATEMENT OR
 OMISSION ...................................................................................................41

 A. Defendants' Opinions Are Not Actionable Under *Omnicare* .............41

  1. Plaintiff Fails to Allege An Actionable Misstatement
  With Respect To Any Of The Challenged Opinions ...............43

  2. Plaintiff Fails To Allege An Actionable Omission With
  Respect To Any Of The Challenged Opinions ........................45

 B. Defendants' Forward-Looking Statements Are Protected By
  The PSLRA Safe Harbor ....................................................................51

IV. PLAINTIFF'S FAILURE TO PLEAD LOSS CAUSATION IS AN
 ADDITIONAL GROUND FOR AFFIRMANCE .........................................54

CONCLUSION ....................................................................................................57

WEIL:\95358684\1\71937.0075

# TABLE OF AUTHORITIES

**Cases**             **Page(s)**

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
    671 F.3d 140 (2d Cir. 2011) ...........................................................28

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...............................................................26, 27

*In re AstraZeneca Sec. Litig.*,
    559 F. Supp. 2d 471 (S.D.N.Y. 2008), *aff'd sub nom. State Univ.*
    *Ret. Sys. of Ill. v. Astrazeneca PLC*, 334 F. App'x 404 (2d Cir. 2009) .............40

*Avon Pension Fund v. GlaxoSmithKline PLC*,
    343 F. App'x 671 (2d Cir. 2009) .......................................................33

*In re Axonyx Sec. Litig.*,
    2009 WL 812244 (S.D.N.Y. Mar. 27, 2009)......................................32

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)..........................................................................50

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..........................................................................27

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan*
    *Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013)....................................55

*City of Edinburgh Council v. Pfizer, Inc.*,
    754 F.3d 159 (3d Cir. 2014) .............................................................45

*City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*,
    679 F.3d 64 (2d Cir. 2012) ..........................................................3, 43

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014) .............................................................53

*Conley v. Gibson*,
    355 U.S. 41 (1957)............................................................................27

*Dalberth v. Xerox Corp.*,
    766 F.3d 172 (2d Cir. 2014) .............................................................55

iii

*Denny v. Barber*,
  576 F.3d 465 (2d Cir. 1978) .............................................................39

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)........................................................................56

*ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ......................................................29, 36

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011) .............................................................43

*Fort Worth Emprs.' Ret. Fund v. Biovail Corp.*,
  615 F. Supp. 2d 218 (S.D.N.Y. 2009) .................................31, 40, 56

*In re Genzyme Corp. Sec. Litig.*,
  754 F.3d 31 (1st Cir. 2014)...............................................................52

*In re IPO Sec. Litig.*,
  399 F. Supp. 2d 298 (S.D.N.Y. 2005), *aff'd sub nom. Tenney v.*
  *Credit Suisse First Boston Corp., Inc.*, 2006 WL 1423785
   (2d Cir. May 19, 2006) ..............................................................55, 56

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*,
  32 F.3d 697 (2d Cir. 1994) ...............................................................48

*Janese v. Fay*,
  692 F.3d 221 (2d Cir. 2012) .............................................................54

*Joffee v. Lehman Bros., Inc.*,
  410 F. Supp. 2d 187 (S.D.N.Y. 2006), *aff'd,* 209 F. App'x 80 (2d Cir. 2006) ..56

*Jones v. Perez*,
  550 F. App'x 24 (2d Cir. 2013) ...................................................36, 42

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001) .....................................................33, 35, 36

*Kleinman v. Elan Corp., plc*,
  706 F.3d 145 (2d Cir. 2013) ...............................................42, 45, 51

*Kovtun v. VIVUS, Inc.*,
  2012 WL 4477647 (N.D. Cal. Sept. 27, 2012).................................43

iv

*Kuyat v. BioMimetic Therapeutics, Inc.*,
   747 F.3d 435 (6th Cir. 2014) ...................................................................37, 39

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ...............................................................54

*Levine v. NL Indus., Inc.*,
   926 F.2d 199 (2d Cir. 1991) ...............................................................49

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008) ...............................................................52

*Matrixx Initiatives, Inc. v. Siracusano*,
   131 S. Ct. 1309 (2011)........................................................................50

*McCall v. Pataki*,
   232 F.3d 321 (2d Cir. 2000) ...............................................................54

*In re Nortel Networks Corp. Sec. Litig.*,
   539 F.3d 129 (2d Cir. 2008) ...............................................................34

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ............................................29, 33, 36, 37

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015)...............................................................*passim*

*P. Stolz Family P'ship L.P. v. Daum*,
   355 F.3d 92 (2d Cir. 2004) .................................................................53

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*,
   712 F.3d 705 (2d Cir. 2013) ...............................................................26

*In re ProShares Trust Sec. Litig.*,
   728 F.3d 96 (2d Cir. 2013) .................................................................50

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) .........................................................26, 41

*Roth v. Jennings*,
   489 F.3d 499 (2d Cir. 2007) ...............................................................28

v

*Rothstein v. UBS AG,*
  708 F.3d 82 (2d Cir. 2013) ................................................................27, 35

*S. Cherry St., LLC v. Hennessee Grp. LLC,*
  573 F.3d 98 (2d Cir. 2009) ................................................................36, 38

*Slayton v. Am. Express Co.,*
  604 F.3d 758 (2d Cir. 2010) ..............................................................52, 53

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007) ...........................................................................29, 30

*In re UBS AG Sec. Litig.,*
  2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom.*
  *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,*
  752 F.3d 173 (2d Cir. 2014) ..................................................................33

**Statutes and Rules**

15 U.S.C. § 78u-4 .......................................................................................29

15 U.S.C. § 78u-5 ...................................................................................51-52

21 U.S.C. § 355 ..........................................................................................11

42 U.S.C. § 262 ......................................................................................11, 12

21 C.F.R. § 14.1 ..........................................................................................14

21 C.F.R. § 14.5 ..........................................................................................14

21 C.F.R. § 14.40 ........................................................................................14

21 C.F.R. § 312.21 ......................................................................................13

21 C.F.R. § 312.22 ......................................................................................13

21 C.F.R. § 312.41 ..................................................................................14, 51

21 C.F.R. § 312.42 ..................................................................................13, 37

21 C.F.R. § 312.47 ......................................................................................13

21 C.F.R. § 314.126 .....................................................................................12

vi

21 C.F.R. § 356(b)(1)................................................................17

21 C.F.R. § 601 ...............................................................12, 14

**Other Authorities**

52 Fed. Reg. 8798 (Mar. 19, 1987).....................................13, 32

63 Fed. Reg. 49583 (Sept. 16, 1998) ..................................12, 51

78 Fed. Reg. 63481 (Oct. 24, 2013)....................................22, 23

WEIL:\95358684\1\71937.0075

## TABLE OF DEFINED TERMS

| Defined Term | Definition |
|---|---|
| CAC | Amended Class Action Complaint dated April 28, 2014 |
| BLA | Biologics license application |
| CRL | Complete response letter |
| CVRs | Sanofi contingent value rights |
| CW | Confidential witness from the CAC |
| EMA | European Medicines Agency |
| EU | European Union |
| Exchange Act | Securities Exchange Act of 1934 |
| FDA | U.S. Food and Drug Administration |
| FFDCA | Federal Food, Drug, and Cosmetic Act |
| ILEX | Ilex Oncology, Inc. |
| JA | Joint Appendix |
| MS | Multiple sclerosis |
| NIH | National Institutes of Health |
| PHSA | Public Health Service Act |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| SA | Special Appendix |
| SAD | sustained accumulation of disability |
| sBLA | Supplemental BLA |

Defendants-Appellees ("Defendants") respectfully submit this brief in opposition to Plaintiff-Appellant's ("Plaintiff") appeal from the Opinion and Order, dated January 28, 2015 ("Opinion"), of the United States District Court for the Southern District of New York (Engelmayer, J.) dismissing the CAC in its entirety.

## <u>COUNTERSTATEMENT OF THE ISSUES</u>

1.     Whether the district court correctly dismissed Plaintiff's claims for failure to plead scienter, when the only "cogent" and "compelling" inference to be drawn from the facts alleged or otherwise properly considered on a motion to dismiss was a nonculpable one -- namely, that Defendants honestly and reasonably believed their positive statements about the results of the Phase 3 clinical trials for Lemtrada and its market potential.

2.     Whether the district court correctly dismissed Plaintiff's claims for failure to plead a material misstatement or omission because Defendants' statements (i) were opinions not alleged to be disbelieved when made or without a reasonable basis, consistent with the standard recently articulated by the Supreme Court in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015); and (ii) constituted forward-looking statements protected from liability under the PSLRA safe harbor and the bespeaks caution doctrine.

3.     Whether, as argued to but not reached by the district court, Plaintiff's failure to plead loss causation is an additional ground for affirmance.

## COUNTERSTATEMENT OF THE CASE

### A.     Preliminary Statement

Plaintiff's appeal brief, like his submissions below, confirms that the claims in this case are based on a singular fiction: that Defendants allegedly knew, via Genzyme's contemporaneous dialogue with the FDA, that the Phase 3 trials for Lemtrada® were "unlikely" to secure FDA approval due to their "single-blind" design.   But as the district court recognized, the FDA *approved* that design, informed Genzyme that the trials *could support* approval if the results were robust, and even placed the trials on its "*Fast Track*" to expedite the review process. Consequently, the court found that "the FDA's comments simply did not contradict Sanofi's public statements," and that Defendants' "expressed opinions," the crux of the CAC, had an "ample basis in fact" and "there is no basis to conclude that defendants did not genuinely believe what they were saying at the time they said it." SA26, 49.  Plaintiff offers no reason to disturb that decision on appeal.

Indeed, unable to demonstrate that Defendants did *not* genuinely hold their stated opinions, Plaintiff instead debates their prudence.  But this Court has made clear that this type of second-guessing, all too easy with the benefit of hindsight, is insufficient to state a securities claim -- particularly where, as here, the complaint

WEIL:\95358684\1\71937.0075

is "devoid even of conclusory allegations that defendants did not believe in their statements of opinion" at the time. *City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 68-69 (2d Cir. 2012) (citation omitted). And while Plaintiff takes issue with the inferences the district court drew and certain of the conclusions it reached, *nowhere* in his brief does Plaintiff offer a response to the district court's core holding that the allegations

> recite no facts indicating that defendants did not in fact expect FDA approval within the timeframe their statements articulated. And, absent concretely pled facts to this effect, the inference that . . . plaintiffs ask the Court to draw -- that Sanofi acquired Genzyme and continued to fund the Lemtrada clinical trials while secretly believing that FDA approval was unlikely, impossible, or, if achievable, only on a delinquent time schedule -- is implausible and conjectural.

SA27 (citations omitted); *see also* SA37, 48 (referring back to SA26-31).

Moreover, Plaintiff does nothing to rejuvenate his threadbare allegations of scienter. Put simply, this is an alleged fraud in desperate search of a motive. As Plaintiff would tell it, Defendants sank hundreds of millions of dollars into a decade-long development project, enrolled patients and physicians, published trial results, took an existing marketed product based on the same active ingredient as Lemtrada (with tens of millions of dollars in annual sales) off the market, and prepared and filed formal marketing applications -- all the while knowing that the trials were fatally flawed and that the application would be rejected by the FDA. And Defendants undertook this futile and financially disastrous scheme for *no*

discernible benefit. There is not a single allegation in the CAC that answers the most basic question in any securities fraud action: why? As the district court aptly stated: "The most plausible inference is . . . that defendants honestly believed their descriptions of the data and did not anticipate that the FDA would adopt a different view." SA51.

\* \* \*

In short, Plaintiff's arguments were all considered and properly rejected by the district court in a well-reasoned, 57-page decision. That decision should be affirmed in all respects.

## B. **The Disposition Below**

By Opinion and Order dated January 28, 2015 (SA1-57), the district court dismissed the CAC in its entirety.[1]

Fatal to all claims, the court held that Plaintiff failed to plead an actionable misstatement or omission. The court divided the statements challenged in the CAC into three subjects: statements about Lemtrada's (1) launch (SA36-38), (2) clinical

---

[1] In the Opinion, the district court also dismissed in its entirety the complaint in the related action captioned *AG Funds, L.P. v. Sanofi*, 14-cv-2211. That portion of the Opinion, although it overlaps substantially with the portion addressing and dismissing the CAC, is the subject of a related appeal, 15-623-cv, and is addressed in Defendants' brief therein.

WEIL:\95358684\1\71937.0075

results (SA38-51), and (3) side effects (SA52-54).  Only the first two subjects are

at issue on this appeal.[2]

On the first subject, the court explained:

> To the extent these statements reflect objective facts -- *i.e.*, that defendants were "prepar[ing]" for "the launch of Lemtrada" in late 2012, and that Lemtrada was "rolling out" in late 2013 -- they are neither false nor misleading.  By the end of 2013, Lemtrada had been approved for marketing and distribution in the European Union, Canada, and Australia.  In early 2014, Lemtrada was also approved in Mexico and Brazil.  Accordingly, . . . the drug was in fact launching in dozens of other countries.  The class-action plaintiffs do not plead facts to the contrary. . . .

> To the extent the statements . . . articulate subjective opinions -- *i.e.*, that defendants felt "relaxed," and "satisfied," and "expect[ed] a decision on Lemtrada [by the FDA] by the end of the year" -- they are not actionable. . . .    The CAC does not adequately plead that defendants' opinions were objectively unreasonable or were not honesty believed when stated.  The CAC thereby fails to plead both the false statement and scienter elements of its various claims.  Similarly, these . . . statements are protected by the PSLRA safe harbor.  They are forward-looking in that they voice defendants' expectations regarding Lemtrada's debut into the global market.  And, although these statements were not uniformly accompanied by cautionary language, plaintiffs do not allege concrete factual particulars that support an inference that the statements were "made with actual knowledge that [they were] false or misleading."  The CAC . . . instead alleges only that defendants were aware of the FDA's concerns and therefore "knew *or* were severely reckless in disregarding" the misleading nature of their statements.

---

[2]     Plaintiff does not challenge the district court's decision on the third subject (Br. at 19 n.7), so that subject (and the district court's decision thereon) is not addressed herein.  In addition, the district court identified a fourth category applicable only to the *AG Funds* action:  statements regarding Lemtrada's prospects of timely FDA approval.  SA25-36.  The district court's analysis of that subject is discussed in Defendants' brief in the related appeal.

WEIL:\95358684\1\71937.0075

SA36-38 (citations omitted) (alterations in original).

On the second subject (clinical results), Plaintiff contended that "while lauding the clinical trial results, defendants did not disclose that the FDA had expressed concerns about the single-blind study design such that a particularly strong treatment effect was required for approval." SA39. The court disagreed. First, although recognizing that "[i]t is undisputed that defendants never disclosed the specific FDA feedback cited in the CAC," SA40, the court found that "much of the information conveyed to Sanofi by the FDA was publicly available," and

> [g]iven this publicly available information, a reasonable investor had reason to know that the design of the Lemtrada clinical trials fell short of the FDA's gold standard. Such an investor could reasonably infer that the study design might impede or delay FDA approval. An investor could also reasonably infer that, as the FDA had told Genzyme, the FDA might require a more compelling showing than it would have required from a double-blind study to overcome the limitations of the sub-optimal study design. And indeed, during a call with analysts, defendants acknowledged that if Lemtrada was "going to come to market, they had to have an extremely convincing set of results." Although not attributing that sentiment to the FDA, that statement fairly captured the FDA's admonition to the company -- that given its use of a single-blind clinical testing methodology, a particularly large treatment effect on MS patients would be required to secure FDA approval. . . .
>
> Although defendants certainly could have reported the FDA's statements about its preferred testing methodology and the implications for the company's burden of proof, the failure to disclose those statements was not "false or misleading to a reasonable investor." Importantly, the FDA's methodological commentary cannot be fairly depicted . . . as tantamount to a statement that Lemtrada could not or would not obtain timely FDA approval. . . . Taken on their face, those statements explained that a heightened

6

showing of proof was needed to compensate for the less reliable testing methodology used. The public, through published FDA regulations and guidance, was already on notice that the FDA preferred a double-blind methodology. Since it was "accurately disclosed" that the positive results of the Lemtrada clinical trials stemmed from a single-blind study, it was "understood that those results [were] less significant" than results from a double-blind study would have been.

SA42-44 (citations omitted) (alterations in original).

Second, the court found that the FDA feedback "was part of an ongoing conversation with the agency that defendants had no affirmative legal duty to disclose." SA40. As the court explained:

[I]n a series of cases, courts have rejected claims of material omissions where pharmaceutical companies did not reveal procedural or methodological commentary, or other interim status reports, received from the FDA as to drugs under review.

These courts reasoned that interim FDA feedback is not material because it does not express a binding agency decision and is subject to change as the FDA and pharmaceutical companies work together to develop viable clinical trials and approvable licensing applications. . . . This case comfortably fits that profile.

SA44-45 (citations omitted).

Third, the court similarly rejected Plaintiff's argument that "finding no material misrepresentation here requires crediting a 'truth on the market defense.'" SA46 (citation omitted). "The core of a 'truth on the market defense' is that defendants' misrepresentations could not have 'affected stock price, because the truth already was known.' Here, however, defendants do not argue that the public

was aware of the FDA's interim feedback to the company. Rather, defendants' argument is that that feedback, considered in light of what was undisputedly publicly known, was not material and thus not legally required to be disclosed." *Id.* (citations omitted).

Fourth, the court found that "the eventual sharp drops in the price of the CVRs on November 8, 2013 and December 30, 2013 cannot be taken as evidence of the materiality of the undisclosed FDA commentary." SA47. This was because the drops "did not follow disclosure of the FDA's concerns about the single-blind study design" but, instead, occurred "after the FDA issued a report that 'sharply criticized' Sanofi's application for FDA approval of Lemtrada in a way tantamount to 'rejection of Sanofi's submission,' and again after the FDA formally declined to approve the drug." *Id.* (citations omitted). This information "was new to the market and to defendants alike," and "it is well-settled that . . . '[c]orporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.'" *Id.* (citation omitted).

Finally, the court concluded that many of the statements "are unambiguously statements of opinion," and that the "pleadings do not come close to supplying a factual basis on which to conclude that defendants disbelieved their own statements." SA47-48. In fact, according to the court:

> [T]he surrounding circumstances strongly undermine any such thesis:
> Defendants' substantial investment of money and personnel in the

8

Lemtrada clinical trials over a several-year period is hard to square with the premise that defendants understood that the study design was fatally flawed or that the results made Lemtrada dead on arrival. By far the most logical inference on the facts pled -- indeed, the only plausible inference -- is that defendants (1) sincerely held their optimistic views of the clinical trial results, and (2) were surprised and disappointed by the FDA's temporary -- for the FDA eventually reversed course -- rejection of these results as inadequate.

SA48. Moreover, it was on this same basis, in part, that the Court independently held that Plaintiff failed to plead scienter:

> [B]ased on the facts alleged, the inference of scienter is by no means "at least as compelling" as the "opposing inference of nonfraudulent intent." Defendants, acting with FDA authorization, conducted the Lemtrada clinical trials over a period of years and consistently reported favorable results. The most plausible inference is, therefore, that defendants honestly believed their descriptions of the data and did not anticipate that the FDA would adopt a different view.

SA51 (citations omitted).

However, the court also identified other grounds upon which to reject Plaintiff's scienter allegations, including that: (1) the FDA's comments "simply did not contradict Sanofi's public statements" (*i.e.*, "the FDA did not take any position as to the adequacy of the emerging study data when measured against the standard of proof applicable to single-blind test results") (SA49-50); and (2) the facts alleged did not "support that defendants were 'highly unreasonable' in failing to disclose the FDA's concerns," given that the "gravity of the FDA's negative feedback was muted by a series of encouraging regulatory decisions -- to lift the clinical hold placed after a patient died of sepsis; to allow the clinical trials to

proceed to Phase III; to place the Phase III clinical trials on a fast track; and to accept the sBLA for review." SA50-51 (citations omitted). In sum, "the significance of th[e] feedback became apparent only after the FDA had released its briefing report and its decision not to approve Lemtrada." SA51.

## COUNTERSTATEMENT OF THE FACTS

### A. The Parties

Defendants respectfully refer the Court to paragraph 38 of the CAC (JA83) for a description of Plaintiff. Sanofi is a global healthcare company engaged in the research, development and marketing of healthcare products. JA71 (¶2). Genzyme is a wholly-owned Sanofi subsidiary that specializes in biotechnology. JA72 (¶¶6, 8). The individual Defendants are Christopher Viehbacher, Sanofi's former CEO; Jérôme Contamine, Sanofi's CFO; and David Meeker, Genzyme's CEO. JA83 (¶¶40-42).

### B. Background Of Lemtrada And Sanofi's Acquisition Of Genzyme

Alemtuzumab (Lemtrada's scientific name) is a humanized monoclonal antibody originally developed in the 1980s at Cambridge University. JA244. It was initially developed and approved by the FDA as a treatment for leukemia under the name Campath®. *Id.*

10

Genzyme acquired the rights to alemtuzumab when it acquired ILEX in 2004. JA540. At that time, Genzyme assumed responsibility over an ongoing Phase 2 study of alemtuzumab as a treatment for MS. *Id.*

On February 16, 2011, Sanofi and Genzyme entered into a definitive merger agreement pursuant to which Sanofi would acquire Genzyme for $74 in cash and one CVR per share. JA72 (¶¶8-9). The public history of the negotiations reveals that the two companies differed over the valuation of Genzyme's late-stage product pipeline, including Lemtrada. JA153-68. At the time of the negotiations, Genzyme was conducting two global Phase 3 studies of Lemtrada. JA708-13.

Sanofi and Genzyme ultimately bridged the valuation gap with the CVRs, which entitled holders to potential additional payments (up to $14 per CVR) in the event that (1) the FDA approved Lemtrada by March 31, 2014 (the "Approval Milestone"), and (2) Lemtrada sales reached certain escalating levels. JA73 (¶10). On April 8, 2011, Sanofi completed the acquisition, with Genzyme surviving as a wholly-owned subsidiary. JA416.

## C.   Regulatory Framework For New Biological Drugs

Under the FFDCA, ch. 675, 52 Stat. 1040 (1938), and the PHSA, ch. 373, 58 Stat. 682 (1944), it is unlawful to introduce a drug into interstate commerce unless approved by the FDA as safe and effective for its indicated use. 21 U.S.C. § 355(a), (d); 42 U.S.C. § 262(a). Biological drugs derived from living organisms,

such as Lemtrada, are "licensed" for commercial use on a BLA pursuant to the PHSA. 42 U.S.C. § 262(a), (j); 21 C.F.R. § 601 *et seq.* (FDA regulations governing BLAs).

To obtain BLA approval, new drug "sponsors" are advised to submit proof of efficacy from "adequate and well-controlled studies," as defined in 21 C.F.R. § 314.126(b). JA615-17. One of the recognized forms of control is "active treatment concurrent control," where "[t]he test drug is compared with known effective therapy." 21 C.F.R. § 314.126(b)(2)(iv). Studies using this design "usually include . . . blinding of patients or investigators, or both," depending on the circumstances. *Id.* The FDA has adopted guidance stating that "double-blind[ing] is the optimal approach." 63 Fed. Reg. 49583, 49587 (Sept. 16, 1998). But the FDA has also recognized that it may be "difficult or impossible to blind" both doctors and patients in active concurrent control studies due to "different regimens, different routes of administration, and different toxicities." JA456.

The clinical investigation of biologics is typically divided into three phases:

- *Phase 1*:  introduction of the drug to a small test group of 20-80 subjects to assess its safety;

- *Phase 2*:  closely monitored studies to "evaluate the effectiveness of the drug" in no more than several hundred patients; and

- *Phase 3*:  expanded studies with several hundred to several thousand patients used to gather primary evidence on the drug's risk/benefit profile to support a formal marketing application.

12

*See* 21 C.F.R. § 312.21(A)(1)-(3).

Drug sponsors stay in regular contact with the FDA during this process. For instance, Phase 3 studies may occur only "after preliminary evidence suggesting [the] effectiveness of the drug has been obtained" through Phase 2. *Id.* § 312.21(c). Accordingly, Phase 2 results are presented to the FDA in a series of "end-of-phase 2" meetings in which the FDA also "evaluate[s] the Phase 3 plan and protocols." *Id.* § 312.47(b)(1)(i). These meetings thus serve a crucial role: they are "held before major commitments of efforts and resources to specific Phase 3 tests are made." *Id.* § 312.47(b)(1)(iii).

Throughout the testing period, the FDA may place an ongoing or upcoming study on "clinical hold" if it presents an unreasonable risk to patients. *Id.* § 312.42(a). FDA review expands in Phases 2 and 3 to include an "assessment of . . . the likelihood that the investigations will yield data capable of meeting statutory standards for marketing approval," *id.* § 312.22(a), and the FDA can impose a clinical hold if it finds that "[t]he plan or protocol for the investigation is clearly deficient in design to meet its stated objectives." *Id.* § 312.42(b)(2)(ii).[3] Any other interim comments or feedback by the FDA unaccompanied by a clinical hold are "solely advisory" and "do not require any modification in the planned or

---

[3]    Moreover, the FDA has made clear, given the public interest, that its practice is "to advise a drug sponsor, in advance, if the agency determine[s] that a particular study w[ill] not yield data capable of meeting statutory standards for marketing approval." 52 Fed. Reg. 8798, 8807 (Mar. 19, 1987).

13

ongoing [studies]." *Id.* § 312.41(a), (c).

Following the submission of a BLA, the FDA may decide, in its discretion, to convene an advisory committee of academics and industry experts to guide the review process. *Id.* §§ 14.1(a)(1), 14.5(a) & 14.40(a). But an advisory committee's recommendations do not bind the FDA. *Id.* § 14.5(b). If the FDA does not approve a BLA, it will issue a CRL at the end of the review period explaining that the BLA either will not be approved or requires supplemental information. *Id.* § 601.3(a).

### D. Genzyme's Development of Lemtrada

#### 1. The Phase 2 Study

Phase 2 was an active control trial comparing Lemtrada to the then-standard treatment for MS, Rebif®. JA231, 250. As publicly disclosed in the registry of clinical trials maintained by the NIH, Phase 2 used an "open-label" design: physicians were blinded to the treatment, but patients were not. JA630. This was for several unavoidable reasons, including dramatically different dosing regimens: Lemtrada is administered *once annually*, Rebif *three times per week*. JA638.

In October 2008, the full results of the Phase 2 studies were published by a consortium of physicians involved in the trial in *The New England Journal of Medicine*. JA672-87. They explained that an "infusion-related syndrome associated [only] with alemtuzumab precluded double-blinding." JA685. They

WEIL:\95358684\1\71937.0075

also reported highly effective results: Lemtrada reduced the risk of SAD (worsening of disability) by 71% and the risk of relapse by 74% as compared to Rebif. *Id.*

In April and October 2010, Genzyme reported the results from a four and five-year extension study, showing that over 70% of patients treated with Lemtrada remained *free* of clinically-active disease. JA392, 688. Physicians commenting on the results stated that they "set a new bar for clinical outcomes" in MS and "offer[] a new paradigm" for the treatment of MS. JA689-91, 700.

### 2. The Phase 3 Studies

#### a. Trial Design

In November 2006, Genzyme met with the FDA to discuss Phase 3. JA78 (¶23(a)). Plaintiff emphasizes that the FDA expressed a "prefer[ence]" for "double-blind" studies, but that preference was limited to a situation in which efficacy results were less robust: "a rater-blinded (but patient not blinded) study may be adequate if the effect is large. *However, a totally blinded study is more likely to be found persuasive if the treatment effect is relatively small*." *Id.* (emphasis added). The FDA also described Phase 2 as having provided "encouraging results regarding the efficacy" of Lemtrada, and noted that adequate and well-controlled Phase 3 studies had "the potential to provide data contributing

15

to the establishment of substantial evidence of efficacy" for an approvable BLA. JA559.

Genzyme submitted protocols for two rater-blinded Phase 3 studies in early 2007. JA78 (¶23(b)). It considered using a double-blind design, but concluded that it was impossible due to: (1) the different dosing regimens; (2) the inability to replicate proprietary and readily identifiable pre-filled syringes of Rebif; and (3) a well-known injection-site reaction associated only with Lemtrada. JA233, 649. Genzyme was also cognizant of precedent for using rater-only blinding in prior MS trials due to the characteristic side effects of available therapies. JA248.

After reviewing the Phase 3 protocols, on May 3, 2007, the FDA permitted the Phase 3 studies to proceed, informing Genzyme that it "may potentially accept th[e] rater-blinded design" for a BLA "[i]f [the] study results reveal an extremely large effect." JA560.

### b. Trial Commencement

In September 2007, Genzyme announced the start of two 24-month "rater-blinded" Phase 3 trials. JA708-13. As with Phase 2, the single-blind design of each trial was publicly disclosed in the NIH registry. JA715-18. The studies were "the largest single program" Genzyme had ever undertaken, with a run-rate "of more than $2 million a week." JA732.

16

In March 2010, before any of the Phase 3 results were available, Genzyme met with the FDA to discuss the plan for statistical analysis of the results. JA78 (¶23(c)). Plaintiff emphasizes that the FDA expressed "concern[]" about "the potential bias introduced . . . by the absence of blinding of patients." *Id.* But, again, the FDA stated that the design could suffice if there were "extremely robust findings." *Id.* In fact, the FDA placed the studies on its "Fast Track" just three months later (JA561), designed to expedite the review of drugs for "serious or life-threatening conditions . . . that demonstrate the potential to address unmet medical needs." 21 C.F.R. § 356(b)(1).

In January 2011, the FDA and Genzyme held a "pre-BLA meeting." JA78 (¶23(d)). Plaintiff selectively quotes the observation that "there was little discussion of the unblinded design of the trials," even though "the lack of double-blinding has consistently concerned [the FDA]." JA79 (¶23(d)). However, the FDA did not suggest that the BLA, based on single-blind studies, could not be submitted but, instead, "emphasize[d] the importance of presenting a full discussion and analysis" of the design that included "descriptions of the procedures for ensuring the blind[ing]" of the raters. *Id.*

### c.    Trial Results

In July and November 2011, Genzyme publicly disclosed initial "top-line" results from the Phase 3 trials. JA765, 779. As compared to Rebif, Lemtrada

17

reduced the risk of relapse between 49% and 55%. *Id.* In October 2011 and April 2012, Genzyme released secondary data from each study. JA770, 788. The secondary data from one trial suggested that patients on Lemtrada experienced a "*reversal* of disability." JA75 (¶17) (emphasis added).

In November 2012, the final results of the trials were disclosed in two comprehensive articles published in *The Lancet*, a leading peer-reviewed medical journal. JA91 (¶59). The authors explained that "masking of patients and treating clinicians . . . was not feasible" due to "different schedules and routes of administration," but that "steps were undertaken to lessen the risk of bias." JA801. They also concluded that the clinical data provided evidence of "substantial efficacy." *Id.*

### E.   Defendants' Public Disclosures Regarding Lemtrada

As detailed above, throughout Phases 2 and 3, Defendants publicly disclosed the trial design and updated investors on the results. Ignoring these disclosures, Plaintiff selectively excerpts and mischaracterizes both the FDA's communications and Defendants' public statements. Based on these flawed allegations, Plaintiff contends that Defendants misled investors by stating that the FDA would approve Lemtrada when they knew from the outset it would not. JA74 (¶13). This version of events is readily refuted.

WEIL:\95358684\1\71937.0075

Indeed, throughout this period, Sanofi and Genzyme updated investors on the status of the BLA. For example, in its first Annual Report after acquiring Genzyme, filed on March 6, 2012, Sanofi disclosed that "[t]he dossier [for Lemtrada] is scheduled to be submitted to FDA review in the second quarter of 2012." JA84 (¶45). This was self-evidently a statement about the timing, and not the anticipated outcome, of the FDA's review. And Sanofi contemporaneously cautioned that "[t]he submission of an application to a regulatory authority does not guarantee that a license to market will be granted," and that regulators "may refuse to grant approval and require additional data before granting approval." JA1247.[4]

On April 27, 2012, Sanofi hosted an earnings call for the first quarter of 2012, during which Mr. Viehbacher stated: "I'm changing my tune on this, but [based on the Phase 3 data] . . . I think [Lemtrada] is going to be a major drug," and "I think . . . the data are [sic] nothing short of stunning." JA87 (¶¶49-50). Plaintiff baselessly claims that these statements of opinion were false, and conveniently ignores that just *two days earlier*, physicians associated with the trials described Lemtrada's efficacy as "unprecedented." JA1303.

On June 12, 2012, Genzyme submitted a BLA to the FDA and a marketing application to the EMA for commercial approval of Lemtrada as a treatment for

---

[4]    The cautionary language that accompanied Defendants' Lemtrada-related disclosures is compiled and reproduced at JA1245-51.

WEIL:\95358684\1\71937.0075

MS. JA88 ¶52. On July 27, 2012, Sanofi announced that it was discontinuing Campath, which, at the time, was responsible for tens of millions of dollars in annual revenue. JA1036.

During Sanofi's subsequent earnings call for the second quarter of 2012, Mr. Viehbacher opined that "Lemtrada is a potential game changer in [MS]." JA89-90 (¶54). However, far from guaranteeing approval, he cautioned that "Lemtrada has been filed with a [statutory decision] date in the second quarter of 2013 . . . [s]o we'll see how things go, but everything looks to be on track at the moment." JA1043. Then, on October 25, 2012, during an earnings call for the third quarter of 2012, and while discussing eight late-stage drugs in Sanofi's pipeline, Mr. Viehbacher commented that he was "very satisfied with where the progress is going." JA90 (¶57). But he made *no* specific assurance about Lemtrada. Similarly, on February 7, 2013, he stated during Sanofi's earnings call for the fourth quarter of 2012 that "[Lemtrada] is probably one of the new medications that is going to truly change, in my opinion, the management of [MS]," and that "we have great hopes here." JA93 (¶64), 1099-100. Of course, Sanofi incorporated the risk disclosures from its Annual Report into *each* of these calls and expressly warned of the "uncertainties inherent" in "decisions by regulatory authorities, such as the FDA or the EMA, regarding whether and when to approve . . . any [BLA]." JA1227-28.

20

During this period, Defendants also spoke about preparing for Lemtrada's launch. For example, during the same fourth quarter 2012 earnings call, Mr. Viehbacher noted that Genzyme built a team "from scratch" so it would be positioned to launch Lemtrada expeditiously. JA92 (¶63). But again, he noted that "[w]e will hear about the regulatory decisions in the course of 2013." *Id.* (¶64). And in March 2013, Sanofi simply advised investors that "[m]arketing applications for Lemtrada are currently under review by regulatory authorities" JA 94 (¶66), and that Genzyme "expect[ed] action on [the] applications this year." JA51 (¶52). Similarly, during Sanofi's second quarter earnings call on August 1, 2013, Mr. Viehbacher discussed Lemtrada potentially "rolling out into a $14 billion market," and responded to questions on pricing. JA97 (¶¶70-71). Plaintiff suggests that these statements misled the market about the ongoing FDA review, but Lemtrada had already been approved for sale in the EU, Mr. Viehbacher's comment was limited to "in the EU," and his responses to questions on pricing were stated in Euros. JA1180, 1182. As for the FDA, he again noted that Sanofi "expect[ed] a decision . . . by the end of the year." JA97 (¶70).

## F. <u>Regulatory Action On Lemtrada</u>

On June 27, 2013, the EMA issued a positive opinion recommending Lemtrada's approval. JA1196. The review committee concluded that "there [is] a favourable benefit-to-risk balance" based on the "quality, safety and efficacy data

WEIL:\95358684\1\71937.0075

submitted." *Id.* The European Commission formally granted marketing authorization for Lemtrada on September 17, 2013. JA1199.

The FDA published notice on October 24, 2013 that an Advisory Committee would hold a public meeting on November 13, 2013 to discuss Lemtrada's sBLA. 78 Fed. Reg. 63481 (2013). The FDA publicly posted materials for the meeting on its website on November 8, including a lengthy "Background Package" for the Committee's consideration. JA508-628. The Background Package contained reviews by three physicians on Lemtrada's clinical safety, clinical efficacy and statistics. JA511. It also excerpted the FDA-Genzyme communications that are summarized above. JA511-12. The Advisory Committee then met on November 13. While a majority of the members (11/18) voted that the Phase 3 trials were not "adequate and well-controlled," a larger majority (12/18) concluded that they provided "substantial evidence of effectiveness . . . for the treatment of . . . relapsing forms of [MS]," and the Committee unanimously determined (with one abstainer) that safety concerns should not preclude approval. JA1208-09.

Nevertheless, on December 30, 2013, Genzyme announced that it had received a CRL advising that the sBLA was not ready for approval in its current form. JA1212-13. Several countries outside of the EU approved Lemtrada soon thereafter, including Canada, Australia, Mexico and Brazil. JA1214-25.

22

On May 30, 2014, Genzyme announced that the FDA "has accepted for review [the] resubmission of its" BLA, and that a decision was "expected in Q4 2014." JA1230-31. The release also explained that the "resubmission is based on data from *the same clinical studies* included in the original BLA, and provides supplemental analyses and additional information to specifically address issues previously noted by the FDA." *Id.* (emphasis added). On November 14, 2014, the FDA approved Lemtrada for the treatment of relapsing forms of MS. JA1578.

## SUMMARY OF THE ARGUMENT

I.    The district court correctly applied the governing legal standards, including in terms of the inferences rationally drawn from the facts alleged or otherwise appropriately considered on Defendants' motion to dismiss.

II.    The district court correctly held that Plaintiff failed to plead facts giving rise to a strong inference of scienter, given that the more "cogent" and "compelling" inference to be drawn from the facts alleged or otherwise appropriately considered on Defendants' motion -- indeed, the *only* rational inference to be drawn from such facts -- is a nonculpable one: that Defendants "honestly believed their descriptions of the data and did not anticipate that the FDA would adopt a different view." SA51.

In addition, the district court correctly held that Plaintiff failed to plead either "motive and opportunity" to commit fraud or "conscious misbehavior and

23

recklessness." Specifically, with respect to the former, the district court first recognized that the CAC alleges no discernible motive, and second, rightly found that one would be impossible to find on the facts alleged -- *e.g.*, in light of Defendants' "substantial investment of money and personnel in the Lemtrada clinical trials over a several-year period," which is "hard to square with the premise that defendants understood that the study design was fatally flawed or that the results made Lemtrada dead on arrival." SA48. And with respect to the latter, the district court properly concluded that the undisclosed FDA comments did not, as they must, contradict Defendants' public statements, including because they spoke to "methodology and process, [and] not . . . the FDA's eventual decision." SA51. That decision fully comports with the weight of authority: where, as here, regulations and agency action leave the possibility of approval open, courts routinely reject similar theories of recklessness.

III.    The district court correctly held that Plaintiff failed to allege an actionable misstatement or omission. Consistent with the Supreme Court's recent decision in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015), which addresses the standard by which statements of *opinion* are to be assessed under the federal securities laws, the district court rightly found that Plaintiff failed to plead the subjective falsity of any of the opinions challenged in the CAC. Indeed, the CAC does not reference *a single*

24

internal report, email or confidential witness, or *any* other form of circumstantial evidence, that suggests, much less pleads with particularity, that Defendants did not genuinely hold their publicly-stated opinions at the time.

In addition, the district court correctly held that Plaintiff failed to plead an actionable omission, even judged against the standard subsequently set out by the Supreme Court in *Omnicare*. As the district court stated, "the FDA's statements to the company could *readily be squared* with the company's anticipated timeline for approval" and "were *by no means inconsistent* with defendants' stated optimism," SA29, 32 (emphasis added), particularly considered in the context of, among other things, (1) Defendants' decade-long back-and-forth with the FDA, (2) the customs and practices of the pharmaceutical industry, and (3) information that was already available to investors (from Defendants or otherwise).

Finally, the district court correctly held that many of the challenged opinions were forward-looking statements protected under the PSLRA safe harbor. The challenged opinions in *Omnicare* were not forward-looking and, thus, the Supreme Court did not have occasion to consider the safe harbor. But here, in contrast, Plaintiff does not dispute that the statements were, in fact, forward-looking or that they were accompanied by "meaningful cautionary language." Nor does Plaintiff allege or otherwise claim that Defendants had "actual knowledge" of the statements' falsity at the time they were made. Indeed, Plaintiff does not address

WEIL:\95358684\1\71937.0075

the safe harbor *at all* in his brief, so he has waived his right to challenge the district court's holding in this regard.

IV.    Defendants argued below that the CAC was separately and independently subject to dismissal because it failed to plead loss causation, including because the conclusions of the FDA physicians summarized in the Background Package did not reveal any previously undisclosed fact.   Rather, they reflected the reviewing physicians' *subjective* assessment that the BLA should not be approved in its then-current form.   That competing view does not reveal that Defendants' earlier opinions were false *at the time they were stated*.   The district court did not reach this argument in the Opinion, but it nevertheless constitutes an additional ground for affirmance.

## STANDARD OF REVIEW

This Court reviews *de novo* the dismissal of the CAC for failure to state a claim.  *See Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004).

## ARGUMENT

## I.    THE APPLICABLE LEGAL STANDARDS

On a motion to dismiss, the court must assume the "well pleaded factual allegations" of the CAC as true, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), but need not accept legal conclusions, labels or strained inferences.  *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 717 (2d Cir. 2013).  A

26

complaint will survive dismissal only if its well-pled facts state a claim to relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To satisfy this standard, the CAC must contain enough factual content to draw a "reasonable" inference that Defendants are liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. Allegations that raise only the "mere possibility of misconduct," or tender "'naked assertion[s]' devoid of 'further factual enhancement,'" fall short. *Id.* (citation omitted).

Plaintiff challenges the district court's application of these legal standards, contending that the court "refused to draw inferences in Plaintiff[]'s favor and instead accepted Defendants[]' version of events." Br. at 38.[5] This argument rests on a fundamental misunderstanding of the law: the district court, as it explained (SA2 n.1, 16), was only obligated to "accept as true all *factual* allegations and draw from them all *reasonable* inferences." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013) (citation omitted) (emphasis added). For the reasons discussed herein, that is precisely what it did.

---

[5] In so arguing, Plaintiff relies on the defunct *Conley v. Gibson*, 355 U.S. 41 (1957), standard that "dismissal is only warranted if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Br. at 35. *Conley* was retired in *Twombly* as "an incomplete, negative gloss on an accepted pleading standard." 550 U.S. at 563.

27

Further, Plaintiff ignores that the court was not strictly limited to the face of the CAC in assessing the reasonable inferences to be drawn therefrom. Br. at 36-40. For example, Plaintiff argues that the district court

> refused to credit the facts as pled and drew inferences in favor of Defendants[] and held as a matter of law that: "the FDA did not state that it would refuse to approve Lemtrada were [a single-blind] methodology used. It stated instead that, to obtain approval, Lemtrada's demonstrated 'treatment effect' would have to be large. . . ." A-1626; SPA-29. However, this conclusion at the pleading stage runs afoul of the recent precedents of this Court.

*Id.* at 38-39. Yet, the court's holding was based on the FDA's *own words*, from documents selectively quoted in the CAC. And as the court also recognized, SA2 n.1, a document relied upon in a complaint is "deemed part of the pleading," *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007), and if an allegation conflicts with it, "the document controls and the allegation is not accepted as true." *Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011).

In addition, Plaintiff argues that the district court impermissibly "made multiple factual determinations regarding the meaning and impact of various public statements alleged in the [CAC]." Br. at 41; *id.* at 41-45. But Plaintiff's principal example "relate[s] to an allegation in the related action" (*id.* at 41 n.11) -- *not* the CAC. Regardless, here, too, Plaintiff misunderstands the analysis. Those examples with some connection to Plaintiff's *actual* allegations (all of which are substantively addressed in context below) reflect an appropriate exercise by the

WEIL:\95358684\1\71937.0075

district court of its obligation on a motion to dismiss to draw reasonable inferences from "the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## II.   THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFF FAILED TO PLEAD SCIENTER

The heart of any securities fraud is scienter -- a mental state embracing an "intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (citation omitted). The PSLRA requires dismissal of any § 10(b) claim that fails to "state with particularity" facts giving rise to a "strong inference" of scienter for each defendant. 15 U.S.C. § 78u-4(b)(2)(A), (b)(3)(A); *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000).

The inference of scienter must be "more than merely plausible or reasonable -- it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. This Court has held that the requisite inference *may* be established by alleging with particularity facts showing either "that defendants had the motive and opportunity to commit fraud" or "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (citation omitted). Viewed against these standards, it is evident that Plaintiff has not adequately pled scienter.

29

A. **Plaintiff Fails To Satisfy *Tellabs***

In determining whether Plaintiff has pled "an inference of scienter at least as likely as any plausible opposing inference," the Court

> must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct.

*Tellabs,* 551 U.S. at 314, 319. "A complaint will survive . . . only if a reasonable person *would*" -- not just *could* -- "deem the inference of scienter cogent and at least as compelling as any opposing inference [of nonfraudulent intent] one could draw from the facts alleged." *Id.* at 324 (emphasis added). As the district court correctly concluded, the CAC does not pass this test.

Plaintiff posits the following theory of fraud: starting in 2007, Genzyme knew that the pivotal trials for Lemtrada were "fatally flawed" and destined to fail before the FDA. Yet, *for the next seven years*, Genzyme invested hundreds of millions of dollars in its single largest trial program, enlisted some of the world's leading MS physicians, enrolled thousands of patients worldwide, conducted two global Phase 3 studies, and published the trial results in peer-reviewed journals -- while Sanofi took an existing marketed product based on alemtuzumab (Campath), which Sanofi owned and was responsible for tens of millions of dollars in annual sales, off the market. And, as Plaintiff would have it, Defendants senselessly

30

undertook this scheme to *nobody's* apparent benefit.  There is *no* allegation that Defendants sold any CVRs, or, for that matter, that Defendants profited *in any way* from the alleged fraud.  Indeed, Defendants were among the greatest *victims*, given the cost of the "doomed" drug trials and, as discussed below, Sanofi's *repurchase of $70 million of CVRs* at allegedly inflated prices during the class period.

There is, of course, an alternative inference rationally drawn from these facts:  Defendants structured drug trials they believed were capable of supporting FDA approval.  Genzyme designed its trials for Lemtrada using an active (rather than a placebo) control and *disclosed* that this design precluded double-blinding. The FDA reviewed the Phase 3 design *in advance*, *allowed* the trials to proceed, advised that they *could* support approval if they showed a large treatment effect, and *placed the trials on its "Fast Track."*  In light of all this, as well as Lemtrada's "unprecedented" efficacy, Defendants genuinely and reasonably believed that Lemtrada would be approved.[6]  And when they expressed that view, they nevertheless *cautioned* investors that the FDA could reject the BLA for any of a

---

[6]    The reasonableness of Defendants' belief has since been confirmed by, among other things, the FDA's subsequent approval of the BLA based on the *same* single-blind studies.  *See Fort Worth Emprs.' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 228 (S.D.N.Y. 2009) ("The last nail in the coffin for plaintiff's theory of scienter is that Defendants' continued belief that BVF-33 would be approved based on a multiple-dose study was demonstrably reasonable, since the FDA ultimately *approved* BVF-33 based on a multiple-dose study and without requiring the submission of data from any single-dose study. . . .").

WEIL:\95358684\1\71937.0075

number of reasons, including its assessment of trial design.  JA1245-51.  This version of events offers something Plaintiff's version does not:  plausibility.

As discussed above, the district court reached this exact conclusion.  SA51. Plaintiff contends that in so holding, the court improperly "scrutinized each of [the CAC's scienter allegations] in isolation."  Br. at 47.  However, the Opinion is clear that the court "view[ed] the circumstances . . . in totality," and found that "the *only* plausible inference" and "[b]y far the most logical inference" was that Defendants "honestly believed their descriptions of the data and did not anticipate that the FDA would adopt a different view."  SA32, 51 (emphasis added).  Plaintiff does not offer *any* basis to disturb that holding.  Indeed, as aptly stated in *In re Axonyx Securities Litigation*, it "virtually defies reason" that any pharmaceutical company "would knowingly or recklessly carry on a defective trial . . . unless [it] was bent on defrauding the FDA and the suffering people who might use the drug."  2009 WL 812244, at *3 (S.D.N.Y. Mar. 27, 2009).[7]

---

[7]     It also defies logic (not to mention the FDA's stated policy) that the FDA would allow patients to receive an experimental drug in trials that were *so* flawed that they foreclosed any possibility of approval.  *See* 52 Fed. Reg. 8798, 8821-22 (Mar. 19, 1987) (clinical hold criteria designed to identify studies "that could not possibly support marketing approval" and "preclude exposure of human subjects to risks in [trials] that . . . have no scientific or regulatory value").

32

### B.   <u>Plaintiff Does Not And Cannot Allege Any Discernible Motive</u>

To adequately plead motive, Plaintiff must allege that Defendants "benefited in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307-08.  Plaintiff has not done so -- nor can he, given, among other things, that (i) no Defendant is alleged to have *sold* CVRs, and (ii) Sanofi, instead, *acquired* $70 million of CVRs during the class period at allegedly inflated prices.  *See*, *e.g.*, *Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009) (increase in holdings "signals only confidence in the future of the[] company and . . . the commercial success of" its product)  (citation omitted); *see also In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *13 (S.D.N.Y. Sept. 28, 2012) ("repurchasing stock at a knowingly inflated price would be economically irrational"), *aff'd sub nom. City of Pontiac Policement's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014).

In a passing reference in one sentence of the CAC, Plaintiff speculates that "profit" somehow motivated Defendants' alleged misrepresentations to investors.  JA ¶21.  This is the *only* "motive" allegation in the CAC, and it is well-settled that the desire to appear profitable is not a cognizable motive.  *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).  Aside from being conclusory, the allegation makes no sense, given that "Sanofi paid $20 billion to acquire Genzyme in large part due

to . . . Lemtrada" and "the two companies conducted the Lemtrada clinical trials over the course of a decade . . . at significant cost." SA26.

Recognizing the infirmity of his allegations, Plaintiff, for the first time on appeal, offers two *new* motive theories: (1) Defendants' "financial motive" to purposefully miss the Approval Milestone and, in turn, "save[] approximately $236 million" and "jeopardize all the other payment milestones" due to "the associated delay in Lemtrada's approval;" and (2) Defendants' "gambl[e] against the odds," given their already "sunk investment," in which they had to "double down" and "hope the results from the [Phase 3] trials were so robust that the FDA would have to approve Lemtrada even in the face of the trails' [sic] poor design." Br. at 53-54. Neither theory was raised below and, thus, both have been waived. In any event, the theories find no support in the CAC and are contrary to settled law.

### 1. Plaintiff's Motive Arguments Have Been Waived

It is a "well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008). Plaintiff failed to raise these -- or *any* other -- motive arguments before the district court. In fact, in light of the absence of motive allegations in the CAC, Plaintiff argued below that it was *irrelevant* that Defendants "had no motive" because he was "not, and ha[s] never been, required to plead motive and opportunity." Opp. 3, 25 n.12. Based on that representation,

34

the district court noted that Plaintiff "do[es] not allege that defendants had a motive to defraud the public." SA22. Accordingly, he should not be allowed to concoct a new motive theory on appeal.

### 2. Plaintiff's New Motive Arguments Fail

Notwithstanding Plaintiff's bare assertion that his new motive arguments are "plausible inferences to be drawn in [his] favor," Br. at 53, neither argument finds any support in the CAC. First, absent *any* supporting facts, the "inference" that Defendants "secretly believ[ed] that FDA approval was achievable . . . on a delinquent time schedule" is "conjectural." SA27; *see also Rothstein*, 708 F.3d at 94 (courts need not accept "legal conclusions couched as factual allegations"). Moreover, even if it were sufficiently pled (and argued below), the theory that Sanofi was motivated to gain FDA approval *after* March 31, 2014 is fundamentally unsound. Plaintiff reasons that Sanofi saved hundreds of millions, if not billions, of dollars in CVR payments by impeding the ability to achieve all subsequent sales milestones. Br. at 53. But those subsequent milestones do *not* have similar deadlines, and Plaintiff *concedes* in the CAC that Sales Milestone #2 *increases* by $1.00 (the amount tied to the Approval Milestone) if the Approval Milestone is not timely achieved. *Id.* (citing JA73). Any supposed "benefit" in gaining FDA approval *after* that date is thus illusory. *See Kalnit*, 264 F.3d at 140 (rejecting motive argument that "makes no sense").

35

Second, Plaintiff's argument that Sanofi was simply "gambling against the odds" is contrary to settled law. This Court has repeatedly rejected claims predicated on economically irrational motives. *See id.* at 140-41 ("Where 'plaintiff's view of the facts defies economic reason . . . [it] does not yield a reasonable inference of fraudulent intent'") (citation omitted); *see also Jones v. Perez*, 550 F. App'x 24, 28-29 (2d Cir. 2013) (same). It defies both logic and economic reason that Sanofi would "throw good money after bad," and lots of it, to continue trials that it knew had little or no chance of succeeding.

### C.  Plaintiff Fails To Plead Conscious Misbehavior Or Recklessness

Absent motive, a plaintiff "must produce a stronger inference" of conscious misbehavior or recklessness. *Kalnit*, 264 F.3d at 143. Conscious misbehavior is defined as "deliberate illegal behavior." *Novak*, 216 F.3d at 308. Recklessness is a mental state "approximating actual intent," *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009), and requires the allegation of particularized facts demonstrating "highly unreasonable" conduct that represents "an extreme departure from the standards of ordinary care." *ECA*, 553 F.3d at 198.

Abandoning any attempt to plead "deliberate illegal behavior," Plaintiff defaults to a theory that Defendants recklessly disregarded facts showing that the FDA was unlikely to approve Lemtrada. Br. at 47-55. To prevail on this theory, he must allege with particularity Defendants' "knowledge of facts or access to

36

information contradicting their public statements." *Novak*, 216 F.3d at 308. He has not and cannot so allege: again, the FDA reviewed the Phase 3 protocols in advance, allowed the trials to proceed with a single-blind design, and placed them on its "Fast Track." And while the FDA expressed concern about the single-blind design, it expressly informed Defendants that such design *could suffice* if the studies showed a large treatment effect. Critically, the FDA *never* placed the Phase 3 trials on clinical hold for being "clearly deficient in design" (21 C.F.R. § 312.42(b)(2)(ii)), and it has since approved the BLA based on the *exact same* single-blind studies.

As the district court held, "the FDA's comments simply did not contradict Sanofi's public statements" about the Phase 3 results. SA50. That is, the FDA did not "take any position as to the adequacy of the emerging study data" but, instead, gave feedback that spoke to "methodology and process, [and] not . . . [its] eventual decision." SA50-51. That holding fully comports with the weight of authority: where, as here, regulations and agency action leave the possibility of approval open, courts routinely reject similar theories of recklessness. *See*, *e.g.*, *Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 441 (6th Cir. 2014) (FDA "recommendation" for different analysis was insufficient basis for scienter because defendants "could legitimately believe that [their analysis] . . . would be sufficient to obtain approval").

37

Plaintiff does not once challenge the district court's holding in this regard or otherwise attempt to argue that Defendants knew facts contradicting their stated views. Instead, Plaintiff offers a series of new arguments as to why scienter is adequately pled or why the court otherwise erred. All fall flat.

First, purporting to rely on the Supreme Court's recent decision in *Omnicare*, Plaintiff argues that a sufficient inference of scienter has been alleged because Sanofi "lacked the basis for making [its] statements." Br. at 48. Putting aside the factual inaccuracies (for all of the reasons set forth above), this argument distorts *Omnicare*'s holding, including because the claims in that case did *not* require scienter -- and, thus, the Court never considered it. *See Omnicare,* 135 S. Ct. at 1331 n.11. And Plaintiff then goes even further afield by suggesting that "[a]n opinion, unreasonably held," establishes scienter (Br. at 48), given that it has long been the law that "unreasonableness" -- *i.e.*, negligence -- does *not* give rise to a strong inference of scienter. *See S. Cherry*, 573 F.3d at 109 (recklessness is "not merely a heightened form of negligence").

Second, Plaintiff argues that scienter can be inferred based simply on the market decline in the price of the CVRs following the release of the Background Package (on November 8, 2013) and the CRL (on December 30, 2013). Br. at 49-

38

50.[8]  Although the December 30 price drop is alleged in the related action, it is *not* in the CAC.  *See also* p. 54, *infra*.  In any event, ever since *Denny v. Barber*, 576 F.3d 465 (2d Cir. 1978), this Court has rejected the pleading of "fraud by hindsight" -- *i.e.*, using what ultimately occurred as evidence of an *earlier* state of mind.  *See also Kuyat*, 747 F.3d at 442 (noting that FDA action at end of class period has "little bearing on what the company did or did not know at the time the allegedly misleading statements were made").

Third, Plaintiff argues that the district court erred by concluding that "the significance of [the] FDA feedback became apparent only after the FDA had released its briefing report and its decision not to approve Lemtrada."  Br. at 39, 54 (quoting SA51).  But Plaintiff ignores the *list of facts* from the CAC that led the court to hold that, "without the benefit of hindsight, Sanofi did not have reason to know that its public statements omitted or misrepresented material facts" *when they were made*.  SA51.

Fourth, Plaintiff argues that Lemtrada's approval in other countries "proves nothing with respect to [its] fate with the FDA."  Br. at 50.  This argument also

---

[8]  Plaintiff also argues that the decline supports an inference that "the FDA's serious concerns . . . had been concealed from investors."  Br. at 37.  Plaintiff calls this the "most obvious explanation," and contends that the district court erred in not "crediting" it.  *Id.*  However, as discussed above, after reviewing "the pleadings and cognizable public statements," the court disagreed and noted that the drops "followed" (1) a report that "sharply criticized" the BLA "in a way tantamount to rejection," and (2) the FDA's formal rejection of the BLA.  SA37.

39

misses the point. What mattered was that those approvals, "in more than 30 countries[,] supported defendants' *interpretations of the [same] study results*." SA49 (emphasis added). Thus, *In re AstraZeneca Securities Litigation*, and its holding that "the approval of [the drug] in Europe for some uses, made it not unreasonable for defendants to believe in their product," is on all fours. 559 F. Supp. 2d 453, 471 (S.D.N.Y. 2008), *aff'd sub nom. State Univ. Ret. Sys. of Ill. v. Astrazeneca PLC*, 334 F. App'x 404 (2d Cir. 2009) (cited at SA49). Plaintiff posits that the court's reliance on *AstraZeneca* was "misplaced." Br. at 50. But the distinction Plaintiff attempts to draw -- that approval was a "coin-flip" in *AstraZeneca* whereas the "situation here [wa]s drastically different" -- falls away upon review of the FDA feedback, which, again, did not contradict Defendants' statements. Br. at 51.

Finally, Plaintiff argues that the district court drew an improper inference from the FDA's ultimate approval of Lemtrada. Br. at 51-52. But the court did no such thing. In fact, it *expressly* disclaimed taking that fact into account *at all*. SA14 n.7. In any event, the later approval only confirms that Defendants' beliefs were "demonstrably true, since the FDA ultimately *approved* [Lemtrada] . . . without requiring the submission of data from any [double-blind] study." *Biovail*, 615 F. Supp. 2d at 226.

40

## III. THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFF FAILED TO PLEAD AN ACTIONABLE MISSTATEMENT OR OMISSION

Plaintiff alleges that Defendants misled the market when they stated their opinions regarding the results of the Phase 3 trials, Lemtrada's launch and market potential, and the anticipated timeline for submitting, and receiving a decision on, the Lemtrada BLA. But Plaintiff fails to plead, as he must, particularized facts demonstrating "why and how" *any* of Defendants' statements were materially false or misleading when made. *Rombach*, 355 F.3d at 174. All of his claims were therefore correctly dismissed.[9]

### A. Defendants' Opinions Are Not Actionable Under *Omnicare*[10]

Drawing the distinction between "fact" and "opinion," the Supreme Court explained in *Omnicare* that "a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot')

---

[9] The district court concluded (and Plaintiff does not dispute on appeal) that many or all of the remaining statements at issue -- including, for example, "that defendants were 'prepar[ing]' for 'the launch of Lemtrada' in late 2012, and that Lemtrada was 'rolling out' in late 2013" -- "reflect objective facts" and, thus, "are neither false nor misleading." SA36.

[10] In *Omnicare,* the Supreme Court addressed a non-fraud claim under § 11 and analyzed, *inter alia*, whether an opinion may be rendered actionably false by omission of a material fact. *Omnicare* thus has no bearing on either of Defendants' alternative, independent grounds for dismissal: (1) that Plaintiff fails to plead scienter (*see* pp. 29-40, *supra*); and (ii) that the challenged statements are forward-looking statements protected by the PSLRA safe harbor (*see* pp. 51-53, *infra*).

41

does not." *Omnicare*, 135 S. Ct. at 1325. Plaintiff does not dispute (*see* Br. at 34) that the challenged statements are opinions. *See*, *e.g.*, *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) (positive descriptions of study results are non-actionable "subjective statements"); *Jones*, 550 F. App'x at 29 (expressing "high degree of confidence" in future growth is a "subjective" opinion).[11]

In *Omnicare*, the Supreme Court held that liability does not attach to "a sincere statement of pure opinion," because the securities laws "do[] not allow investors to second-guess inherently subjective and uncertain assessments." 135 S. Ct. at 1327. The Court held, however, that there are two, narrowly-drawn exceptions to that general rule. First, liability may attach if the opinion is not truly held by the party offering it. *Id.* at 1326. Second, an opinion can be misleading if it "omits material facts about the [speaker's] inquiry into or knowledge concerning . . . [that] opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Id.* at 1329. Plaintiff fails to plead an actionable false opinion under either exception.

---

[11] Even though *Omnicare* sets forth the standards for pleading an actionable false statement or omission (the predicate for Plaintiff's claims here), the Supreme Court's holding and reasoning goes unmentioned by Plaintiff on this appeal, but for a single (misplaced) reference in the context of Plaintiff's scienter argument (*see* p. 38, *supra*).

WEIL:\95358684\1\71937.0075

### 1. Plaintiff Fails to Allege An Actionable Misstatement With Respect To Any Of The Challenged Opinions

Recognizing that every opinion conveys the fact that "the speaker actually holds the stated belief," *Omnicare* held that pure opinions can still constitute an "untrue statement of fact" to the extent the professed belief is not truly held, *Omnicare*, 135 S. Ct. at 1326, leaving the subjective falsity requirement of *Fait v. Regions Financial Corporation*, 655 F.3d 105 (2d Cir. 2011), and its progeny unchanged. *See also City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67 (2d Cir. 2012) (extending *Fait* to claims under Exchange Act).

Yet, as in *CBS*, the CAC is "devoid even of conclusory allegations that defendants did not believe in their statements of opinion" at the time they were made. 679 F.3d at 68-69 (citation omitted). The CAC does not reference *a single* internal report, email or confidential witness, or *any* other form of circumstantial evidence, that suggests, much less pleads with particularity, that Defendants did not genuinely hold their publicly-stated opinions at the time.[12]

Unable to plead *contemporaneous facts* demonstrating that Defendants did

---

[12] Plaintiff's lone CW does *nothing* to cure this fatal deficiency. The CW's only allegation of non-public information is that a "Steering Committee" was "very concerned" about Lemtrada's side effects. JA82 (¶32). But even if true, it is not surprising that a drug company conducting a clinical trial with thousands of patients would be "concerned" about side effects. *See Kovtun v. VIVUS, Inc.*, 2012 WL 4477647, at *18 (N.D. Cal. Sept. 27, 2012) ("[T]here is nothing ominous or even surprising about employees of a pharmaceutical company that is developing a new drug engaging in discussions about safety issues."). Nor does it cast Defendants' "sincere optimism" about Lemtrada's prospects into doubt. SA29.

WEIL:\95358684\1\71937.0075

not genuinely hold their stated opinions, Plaintiff relies on Mr. Viehbacher's *after-the-fact* comment on January 23, 2014, following the release of the CRL, that the FDA's decision was not "a total surprise." JA77 (¶21); JA80 (¶27); JA104 (¶84(v)); Br. at 43. Plaintiff calls this statement an "admission" -- namely, "that [Sanofi] was well-aware of the substantial likelihood that Lemtrada would not be approved." Br. at 43. However, once the comment is placed in context, *see Omnicare*, 135 S. Ct. at 1335, Plaintiff's "admission" argument falls away. After being asked whether the FDA's decision initially not to approve the BLA was a "letdown," Mr. Viehbacher stated:

> [I]t's actually something that wasn't a total surprise, because when we acquired Genzyme, we actually created a contingent value right, recognizing that it was not going to be an easy thing to bring Lemtrada to the market. This is a drug that's been in development for quite some time. That having been said, this is a drug that's been approved by 30 countries in the world. We're seeing patients who have gone five years without a relapse. So we believe that the drug actually is working and it's important for patients, and that's why for the first time in my 25 years in this industry we're thinking about doing an appeal with the FDA.

JA1235. Thus, Mr. Viehbacher did "not concede that he (and the company) knew all along that the FDA would reject Lemtrada. Rather, the statement admits no more than that the company regarded FDA approval as uncertain" -- a "proposition . . . consistent with Sanofi's public statements about Lemtrada's prospects," SA28, and the uncertainty inherent in every opinion, *Omnicare*, 135 S. Ct. at 1325 (citations omitted), including in the FDA context, as the district court properly

44

recognized. SA27 (citing *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 558 (S.D.N.Y. 2004)).

In addition, the story of Lemtrada's development and Defendants' attendant business decisions belie Plaintiff's contention that Defendants "knew" the Phase 3 trials were fatally flawed. Br. at 13, 21-22. The district court aptly noted in this regard that the "substantial investment of money and personnel in the Lemtrada clinical trials over a several-year period is hard to square with the premise that defendants understood that the study design was fatally flawed;" (SA48) instead, it "strongly indicate[s] that they regarded Lemtrada as a promising new drug." SA26. This Court, too, has recognized that initiating Phase 3 studies only occurs upon satisfying "business and regulatory interests." *Kleinman*, 706 F.3d at 153 (citing 21 C.F.R. § 312.21(c)); *see also City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014) ("[T]he initiation of Phase 3 cost millions of dollars and required FDA approval, rendering it improbable that defendants would have continued . . . if they thought the drug a complete failure.") (citing *Kleinman*, 706 F.3d at 153).

## 2. Plaintiff Fails To Allege An Actionable Omission With Respect To Any Of The Challenged Opinions

The Supreme Court also made clear in *Omnicare* that whether an omission of fact renders an opinion misleading will always depend on the context:

WEIL:\95358684\1\71937.0075

> Investors do not, and are right not to, expect opinions contained in [public] statements to reflect baseless, off-the-cuff judgments, of the kind that an individual might communicate in daily life. At the same time, an investor reads each statement within such a document, whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information. And the investor takes into account the customs and practices of the relevant industry. So an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame.

*Id.* at 1330. Thus, the Supreme Court emphasized that an investor must plead more than conclusory assertions to adequately state an omission claim. Citing its opinion in *Iqbal*, the Supreme Court explained that an "investor must identify particular (and material) facts going to the basis for the issuer's opinion -- facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have -- whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context. . . . *That is no small task for an investor*." *Id.* at 1332 (emphasis added). Just because an opinion "turned out to be wrong" is not enough. *Id.*

Further, the Supreme Court made clear that an opinion is not misleading simply because a company "knows, but fails to disclose, some fact cutting the other way." *Id.* at 1329. "A reasonable investor does not expect that *every* fact known to an issuer supports its opinion statement." *Id.* Rather, investors appreciate that opinions often rest on a "weighing of competing facts." *Id.* Consequently, the *Omnicare* standard asks only if "the excluded fact shows that

[the speaker] lacked the basis for making th[e] [opinions]" when considered together with "other . . . information available" at the time. *Id.* at 1333.

Although decided before *Omnicare*, the district court's Opinion fits squarely within its four corners: analyzing the statements "in context," the district court correctly held that "the FDA's statements to the company could readily be squared with the company's publicly anticipated timetable for approval," SA29, and Defendants' view of the Phase 3 data had "ample basis in fact." SA49. Specifically, the district court reasoned that, "[a]s pled, in expressing misgivings about a single-blind methodology, the FDA did not state that it would refuse to approve Lemtrada were this methodology used" but, instead, "stated . . . that . . . Lemtrada's demonstrated 'treatment effect' would have to be large -- *i.e.*, the company would carry a heavier burden of proof than if a double-blind approach had been used -- to compensate for the bias potentially introduced by a single-blind methodology." SA29-30 (citations omitted). And that is *exactly* what the data showed when Defendants expressed their opinions. Plaintiff does not, and cannot, explain how or why that reasoning was inconsistent with any aspect of *Omnicare*.

Moreover, when they expressed their opinions, Defendants nevertheless warned that the FDA could deny the BLA for any number of reasons, including trial design or disagreement with the quality of the data submitted. JA1244-51. These "hedges, disclaimers, [and] qualifications" further confirm that, when

47

viewed in context, Defendants' opinions were neither false nor misleading. *Omnicare*, 135 S. Ct. at 1333.

*Omnicare* also stressed "tak[ing] into account the customs and practices of the relevant industry" as part of the broader "context." *Omnicare*, 135 S. Ct. at 1330. That too was done here, as the authorities on which the district court relied recognize that a "continuous dialogue [with] the FDA . . . is the essence of the product license application process," and "[p]roblems, issues, and questions arise 'in a random or sporadic fashion.'" SA45 (citing, *e.g.*, *In re MedImmune, Inc. Sec. Litig.*, 873 F. Supp. 953, 966 (D. Md. 1995)). Thus, no reasonable investor would expect that the FDA had spoken to Defendants with unwavering voice throughout the entirety of Lemtrada's decade-long development. Non-disclosure of every aspect of the FDA's interim methodological feedback does not render Defendants' well-supported opinions misleading.

Ignoring *Omnicare*, Plaintiff argues that the district court erred and that Defendants' opinions are actionable solely because Defendants did not disclose the FDA "concerns" about the blinding of the Phase 3 trials. Br. at 19-23. This is a theory nowhere to be found in the CAC. To the contrary, Plaintiff impermissibly alleges that each and every challenged statement is misleading because of the conclusions reached by the FDA physicians in the Background Package *at the end of the putative class period* (JA 84-99 (¶¶45-74)). *See, e.g.*, *Jackson Nat'l Life Ins.*

48

*Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir. 1994) (securities claims cannot be sustained on allegations of "fraud by hindsight"). In any event, the record is clear that the FDA laid a pathway to approval based on the use of a single-blind design, as long as the treatment effect was large. Defendants were entitled to rely on that guidance in forming their opinion concerning the likelihood of FDA approval, particularly given that the treatment effects Defendants were contemporaneously disclosing publicly were indeed indisputably large.

Beyond that, Plaintiff resorts to generalities and mischaracterizations. For example, relying on the basic principle that "once a company speaks on an issue or topic, there is a duty to tell the whole truth," Plaintiff insists that the FDA feedback should have been disclosed. Br. at 23-25 (citation omitted). But Plaintiff conflates materiality and a duty to disclose -- he suggests that by purportedly pleading the former, he has necessarily pled the latter. Both the Supreme Court and this Court, however, have repeatedly held otherwise. *See Omnicare*, 135 S. Ct. at 1333 ("whether the omitted fact would have been material" and whether it "rendered [the] opinions misleading" are two separate inquiries); *Levine v. NL Indus., Inc.*, 926 F.2d 199, 202 (2d Cir. 1991) (to be actionable, "the omitted information must have been material *and* there must have been a duty to disclose it") (emphasis added). Indeed, this Court has recently confirmed that "materiality alone does not

demand disclosure." *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 101 (2d Cir. 2013) (citation omitted).  Plaintiff, in any event, fails to allege either.

First, contrary to Plaintiff's suggestion, materiality is "a meaningful pleading obstacle." *ProShares*, 728 F.3d at 102.  In fact, the Supreme Court was "careful not to set too low a standard of materiality, for fear that management would bury the shareholders in an avalanche of trivial information." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011) (citation omitted).  The non-dispositive interim feedback from the FDA on an approved trial design would not, as Plaintiff insists, "significantly alter[] the total mix of information," *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988), including because "it does not express a binding agency decision and is subject to change."  SA45.[13]

Second, even assuming, *arguendo*, that Plaintiff pled materiality, disclosure is required if, and "only" if, it is "necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx*, 131 S. Ct. at 1321 (citation omitted).  That is, it must be more than just "relevant or of

---

[13]     In so holding, the district court relied on a "substantial body of case law," (SA42) while separately clarifying (in a footnote) that the non-disclosure of the FDA's feedback "would have assuredly been a material omission" if the FDA had given "advance notice of Lemtrada's certain rejection."  SA50 n.15 (citations omitted).  Plaintiff ignores the cited cases and just attacks the footnote, criticizing the court for creating a standard under which FDA feedback is immaterial unless "it forecloses all possibility of a drug's approval."  Br. at 33.  But the court created no such standard; it merely offered an example at the extreme end of the spectrum, for illustration only.

50

interest to a reasonable investor." *Kleinman*, 706 F.3d at 153 (quoting *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002)). Relying on *Kleinman*, the district court held that a reasonable investor would not be misled by omission of the FDA's concerns about the single-blind design because (1) the FDA had publicly expressed its preference for double-blinding and (2) it was publicly disclosed that the Phase 3 trials were single-blinded. SA43-44. Plaintiff's attempt to distinguish *Kleinman* as a case that did not involve FDA feedback (Br. at 32) misses the point. Its key take-away is that an omitted fact, as here, will not mislead when the public is already aware of information diluting its significance. *Kleinman*, 706 F.3d at 154-55.[14]

## B. Defendants' Forward-Looking Statements Are Protected By The PSLRA Safe Harbor

Plaintiff's claims also fail because many of the challenged statements about Lemtrada's launch and market potential are archetypal forward-looking statements protected by the PSLRA safe harbor, 15 U.S.C. § 78u-5(c), as the district court also correctly concluded. SA37. Plaintiff does not mention, much less attempt to

---

[14] Plaintiff's attempt to minimize the information known by the market is equally unavailing. While he suggests that none of the regulations quoted by the district court support the FDA's preference for double-blind studies (Br. at 29), the court expressly rested that conclusion on statements by the FDA "in regulations and elsewhere." SA40-41. And the FDA has unambiguously stated, in the very same guidance relied upon by this Court in *Kleinman*, 706 F.3d at 155 n.11, that "the double-blind trial is the optimal approach." 63 Fed. Reg. 49583, 49595 (Sept. 16, 1998). Further, Plaintiff is also wrong that FDA regulations do not address the consequences for failing to respond to FDA feedback, Br. at 30, because *all* interim FDA feedback unaccompanied by a clinical hold is "solely advisory" and "does not require any . . . response." 21 C.F.R. § 312.41(c).

WEIL:\95358684\1\71937.0075

refute, this aspect of the Opinion and, thus, he has waived his right to challenge it. *See*, *e.g.*, *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 294 (2d Cir. 2008) (issue deemed "abandoned" when "brief on appeal contains no argument as to why the district court's dismissal was incorrect"). Regardless, any such challenge would be futile.

Because the safe harbor is written in the disjunctive, a party is not liable "if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010). The statements are all protected under one or more of these standards.

First, almost all of the statements reflect the projected time horizon for FDA action, and it is well-settled that such statements are "forward-looking projections that are not actionable Section 10(b) transgressions" under the PSLRA safe harbor. *In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 44-45 (1st Cir. 2014). And Sanofi routinely cautioned in public filings that the FDA review process was inherently uncertain and subject to numerous risks. SA34-36.[15] There can be no serious

---

[15]     Although several of the statements were made on conference calls, the safe harbor covers them too because they were "accompanied by an oral statement that additional information concerning factors that could cause actual results to materially differ . . . is contained in a readily available written document," 15 U.S.C. § 78u-5(c)(2)(B)(i). *See*, *e.g.*, JA1041 (referring to Sanofi's Form 20-F).

WEIL:\95358684\1\71937.0075

dispute that these warnings conveyed "substantive information about factors that realistically could cause results to differ." *Slayton*, 604 F.3d at 771 (citing H.R. Rep. No. 104-369 at 43 (1995)).[16]

Second, several of the forward-looking statements that touch on Lemtrada's market potential express nothing more than *soft* optimism about the future -- "I think this is going to be a major drug," "It is obviously a huge opportunity that we have to [launch] two significant new medicines," etc. JA88 (¶50); JA98 (¶63). Because these statements are "too open-ended and subjective" to constitute "a guarantee of some concrete fact," they are immaterial as a matter of law. *UBS*, 752 F. 3d at 185-86.

Third, Plaintiff does not come close to demonstrating actual knowledge, SA33, which, for purposes of the safe harbor, is "stricter than for statements of current fact" and requires "proof of knowing falsity." *Slayton*, 604 F.3d at 773 (citation omitted). Plaintiff has not pled any *facts* demonstrating that Defendants knew that their forward-looking statements were false. And as the district court correctly held, conclusory allegations that Defendants "should have known" fall well short of this standard. SA33; *see also Slayton*, 604 F.3d at 776 n.9 (the

---

[16]     Relatedly, the "bespeaks caution" doctrine likewise protects forward-looking statements, as here, "sufficiently balanced by cautionary language within the same [filing]." *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96 (2d Cir. 2004).

WEIL:\95358684\1\71937.0075

"objective" inquiry of "recklessness" is insufficient to show the "actual subjective knowledge" required by the safe harbor).

## IV. PLAINTIFF'S FAILURE TO PLEAD LOSS CAUSATION IS AN ADDITIONAL GROUND FOR AFFIRMANCE

Defendants argued below that the CAC failed to plead loss causation, which independently required its dismissal. The district court did not reach this issue. However, it is an additional ground for affirmance, given that the Court may affirm dismissal on "any ground which finds support in the record," *McCall v. Pataki*, 232 F.3d 321, 323 (2d Cir. 2000), including those "not relied on by the district court." *Janese v. Fay*, 692 F.3d 221, 225 (2d Cir. 2012).

To plead loss causation, a complaint must allege that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005). Plaintiff alleges that he suffered losses on November 8, 2013, when, he claims, the FDA "rejected" Lemtrada. JA108 (¶98). Of course, the FDA did not "reject" the application on November 8. In fact, the Background Package (released on November 8) contained a large disclaimer that the positions expressed therein "do not necessarily represent the final position of the [FDA]," and that "the FDA will not issue a final determination on the issues at hand" until a later point. JA509. The formal CRL was not issued until December 30, 2013, after the end of the putative class period. JA1212.

54

Regardless, the Background Package did not "reveal some then-undisclosed *fact* with regard to the specific misrepresentations alleged in the complaint." *Dalberth v. Xerox Corp.*, 766 F.3d 172, 188 (2d Cir. 2014) (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)).  Rather, the summary of the physicians' conclusions in the Background Package on which Plaintiff seizes reflected *subjective* assessments of the Phase 3 data reached at the end of the purported class period.  Put simply, the FDA's interpretation of the Phase 3 data, itself an *opinion*, does not reveal the falsity of Defendants' *competing* interpretation of that same data.  *See id.* at 188-89 (a "negative characterization of previously known information cannot constitute a corrective disclosure" of a positive assessment of the same information by another party); *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013) ("negative *opinions*" cannot be "corrective" because they do not "constitute a corrective disclosure of anything but th[at speakers'] opinions").

Further, the summary of FDA "feedback" about the Phase 3 design that was included in the Background Package -- *i.e.*, the FDA's "concerns" about the single-blind design expressed on three occasions between June 2007 and January 2011 -- is similarly insufficient because "the market will not respond to the truth [of an intentionally false opinion] until the falsity is revealed," *In re IPO Sec. Litig.*, 399 F. Supp. 2d 298, 307 (S.D.N.Y. 2005), *aff'd sub nom. Tenney v. Credit Suisse First*

55

*Boston Corp., Inc.*, 2006 WL 1423785 (2d Cir. May 19, 2006), which it *never* was here. The "critical" allegation, lacking here, is that "the alleged dishonesty of the opinions is revealed to the market." *Joffee v. Lehman Bros., Inc.*, 410 F. Supp. 2d 187, 194 (S.D.N.Y. 2006), *aff'd*, 209 F. App'x 80 (2d Cir. 2006) (citation omitted). There is *no* alleged disclosure revealing that Defendants did not hold their stated opinions at the time they were expressed. Rather, they "maintained [their] stance that a [double-blind] study was not required . . . and that the original [single-blind] study was proper. So defendants persisted in their purported 'misstatements' after the expiration of the class period." *Biovail*, 615 F. Supp. 2d at 229 (internal citations omitted). Therefore, "no corrective disclosure ever occurred." *Id.*

In brief, "the all-but-inevitable decline in the price" of the CVRs following the release the Background Package and, later, the CRL "was caused by the [FDA's] failure to [back] the drug -- not by any 'corrective' disclosure of some prior untruth." *Biovail*, 615 F. Supp. 2d at 229. And because the securities laws do not exist "to provide investors with broad insurance against market losses," *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (citation omitted), it is not enough to allege that the price of the CVRs fell upon the disclosure of some "bad news." *See IPO*, 399 F. Supp. 2d at 266-67.

WEIL:\95358684\1\71937.0075

## **CONCLUSION**

For the foregoing reasons, the district court's Opinion dismissing the CAC

in its entirety should be affirmed.

Dated:  New York, New York       Respectfully submitted,
       June 5, 2015

                         /s/ John A. Neuwirth
                        John A. Neuwirth
                        Joshua S. Amsel
                        Caroline Hickey Zalka
                        Justin D. D'Aloia
                        WEIL, GOTSHAL & MANGES LLP
                        767 Fifth Avenue
                        New York, New York 10153
                        T:  (212) 310-8000
                        F:  (212) 310-8007

                        *Attorneys for Defendants-Appellees*

57

## CERTIFICATION OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,896 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Version 14.0.7147.5001 in Times New Roman font size 14.

 /s/ John A. Neuwirth
John A. Neuwirth